

**SEALED**

FILED

SEP 21 2021

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

WILLIAM DONOVAN
JOHNSON III,
a/k/a "Billy Johnson,"
DAVID SCOTT CHAMBERS,
a/k/a "Scott Chambers,"
GENE OLEN CHARLES RAST,
a/k/a "Charlie Rast,"
SHAUNI BREANNE CALLAGY,
RENEE LYNN HAYNES,
LUIS ALFREDO JACOBO,
a/k/a "Lokz,"
JESUS VALDEZ MARTINEZ,
a/k/a "Jesse Martinez,"
a/k/a "Hostile,"
KELLY WAYNE BRYAN,
CURTIS ANTHONY JONES,
ANTONIO CERVANTES GARCIA
a/k/a "Tony Garcia,"

    Defendants.

Case No. 21-CR-102-CVE

<u>FILED UNDER SEAL</u>

<u>SECOND SUPERSEDING
INDICTMENT</u>
[COUNT ONE: 21 U.S.C. §§
848(a), 848(b), 848(c), and 848(d) –
Continuing Criminal Enterprise;
COUNTS TWO through FIVE: 21
U.S.C. §§ 846 and
841(b)(1)(A)(viii) – Drug
Conspiracy;
COUNTS SIX and SEVEN: 21
U.S.C. §§ 856(a)(1) and 856(b) –
Maintaining a Drug-Involved
Premises;
COUNTS EIGHT and
THIRTEEN: 18 U.S.C. §
1952(a)(3) – Interstate Travel to
Aid Racketeering;
COUNT NINE: 21 U.S.C. §§
841(a)(1) and 841(b)(1)(B)(viii) –
Possession of Methamphetamine
with Intent to Distribute;
COUNT TEN: 18 U.S.C. §
924(c)(1)(A)(i) – Possession of
Firearm in Furtherance of a Drug
Trafficking Crime;
COUNT ELEVEN: 21 U.S.C. §§
841(a)(1) and 841(b)(1)(A)(viii) –
Possession of Methamphetamine
with Intent to Distribute;
COUNT TWELVE: 21 U.S.C. §§
841(a)(1) and 841(b)(1)(C) –
Possession of Methamphetamine
with Intent to Distribute;
Forfeiture Allegation: 21 U.S.C. §
853, 18 U.S.C. § 981(a)(1)(C), and

**THE GRAND JURY CHARGES:**

<u>COUNT ONE</u>
**[21 U.S.C. §§ 848(a), 848(b), 848(c), and 848(d)]**

Beginning in or about May 2016 and continuing to on our about the date of this Second Superseding Indictment, in the Northern District of Oklahoma and elsewhere, the defendant, **LUIS ALFREDO JACOBO**, a/k/a "Lokz," knowingly and intentionally engaged in a continuing criminal enterprise ("CCE") in that he knowingly and intentionally violated Title 21, United States Code, Sections 841(a)(1), 846, and 856(a)(1), which violations included, but were not limited to, those substantive violations alleged in the following Counts in this Second Superseding Indictment:

| Counts | Description of Violations |
|---|---|
| **2 through 5** | Drug Conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(viii) |
| **9** | Possession of Methamphetamine With Intent to Distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii) |
| **11** | Possession of Methamphetamine With Intent to Distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii) |
| **12** | Possession of Methamphetamine With Intent to Distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) |
| **6 and 7** | Maintaining a Drug-Involved Premises, in violation of 21 U.S.C. § 856(a)(1) |

The above-listed violations are realleged and incorporated herein as though fully set forth in this Count, and which violations were part of a continuing series of

violations of the Controlled Substances Act, Title 21, United States Code, Section 801, et seq., undertaken by **JACOBO** in concert with at least five other persons with respect to whom **JACOBO** occupied positions of organizer, supervisor, and any other position of management, and from which such continuing series of violations **JACOBO** obtained substantial income and resources.

Furthermore, **JACOBO** was a principal administrator, organizer, supervisor, and leader of the CCE, which involved possession with intent to distribute and distribution of methamphetamine, a Schedule II controlled substance, and the amounts of said methamphetamine was 300 times the quantity of the substance described in Title 21, United States Code, Section 841(b)(1)(B).

All in violation of Title 21, United States Code, Sections 848(a), 848(b), 848(c), and 848(d).

## COUNT TWO
## [21 U.S.C. §§ 846 and 841(b)(1)(A)(viii)]

Beginning as early as in or about May 2016 and continuing until in or about December 2018, in the Northern District of Oklahoma and elsewhere, the defendant, **LUIS ALFREDO JACOBO**, a/k/a "Lokz," did knowingly, intentionally, and willfully conspire, confederate, and agree with S.G., a person known to the Grand Jury, and with others known and unknown to the Grand Jury, collectively referred to as the **S.G. DRUG TRAFFICKING ORGANIZATION ("the S.G. DTO")** to commit offenses against the United States, as follows:

### OBJECTS OF THE S.G. CONSPIRACY

The objects of the **S.G. CONSPIRACY** were:

1. To possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code Section 841(a)(1).

2. To distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code Section 841(a)(1).

### PURPOSE OF THE S.G. CONSPIRACY

The purpose of the **S.G. CONSPIRACY** was to enrich the **S.G. DTO** illegally through the illicit sale of methamphetamine to addicts and drug users who had no lawful means of acquiring the controlled substance.

## MEANS AND METHODS OF THE S.G. CONSPIRACY

The objects of the **S.G. CONSPIRACY** were accomplished by the following means and methods, among others:

3. **JACOBO** would and did obtain methamphetamine from **JACOBO**'s sources of supply in Mexico and would and did distribute it to subdistributors like S.G. for resale to addicts and users, so that the **S.G. DTO** would profit from the sales.

4. The **S.G. DTO** would and did use **JACOBO**'s hometown of Bakersfield, California, as a base of operations.

5. Between in or about May 2016 and in or about May 2018, S.G. lived in Bakersfield and received methamphetamine from **JACOBO**, and from others whom **JACOBO** directed, in and around Bakersfield.

6. Between in or about May 2018 and in or about December 2018, S.G. lived in and around Grove, Oklahoma, which is in the Northern District of Oklahoma, and received methamphetamine from **JACOBO**, and from others whom **JACOBO** directed, via mail parcel.

7. At all times, **JACOBO** directed and organized the activities of the **S.G. DTO** from Bakersfield, California, including setting the prices S.G. would pay **JACOBO**, determining where S.G. would go to obtain methamphetamine, delegating responsibilities to others in Bakersfield involving the delivery of methamphetamine to S.G., and approving any suggestions S.G. would make about how the **S.G. DTO** would operate.

8. While S.G. was living in Bakersfield, **JACOBO** would and did not allow S.G. to receive methamphetamine directly from **JACOBO** but rather would and did direct S.G. to obtain the methamphetamine from others working at his direction. **JACOBO** would and did refer to the others who would distribute methamphetamine directly to S.G. as "runners."

9. While S.G. was living in Bakersfield, **JACOBO** would and did commonly direct S.G. to pick up ounces of methamphetamine from a runner **JACOBO** called "Junior."

10. While S.G. was living in Bakersfield, **JACOBO** would and did commonly direct S.G. to go to various houses in Bakersfield to obtain methamphetamine from runners.

11. S.G. would and did obtain quantities of methamphetamine from **JACOBO** "on front," or without paying upfront for the methamphetamine.

12. S.G. would and did pay **JACOBO** for the methamphetamine after S.G. had sold it to others for profit.

13. While S.G. was living in Bakersfield, **JACOBO** would and did provide S.G. and cause S.G. to be provided approximately one ounce of methamphetamine per day for S.G. to redistribute.

14. While S.G. was living in Bakersfield, S.G. would and did introduce additional redistributors to **JACOBO** and suggest that **JACOBO** employ those redistributors to sell methamphetamine.

15. One of the additional redistributors to whom S.G. introduced **JACOBO** was an individual known to the Grand Jury as "A.P."

16. While S.G. was living in Grove, **JACOBO** would and did cause S.G. to be provided with approximately two pounds of methamphetamine each week.

17. **JACOBO** would and did charge S.G. approximately $3,000 per pound of methamphetamine.

18. While S.G. was living in Grove, S.G. would and did cause **JACOBO** to be paid for methamphetamine through various methods, as directed by **JACOBO**.

19. The ways in which S.G. would and did cause **JACOBO** to be paid included sending bundles of cash from the Northern District of Oklahoma and elsewhere to Bakersfield and elsewhere by mail parcel; transferring cash from the Northern District of Oklahoma and elsewhere to Bakersfield and elsewhere using money remitters like Western Union and MoneyGram; and transferring money electronically using smartphone applications like "Bluebird" by American Express.

20. **JACOBO** would and did use a "Bluebird" account that was linked to his email address "luisjacobo2014@gmail.com."

21. While S.G. was living in Grove, **JACOBO** would and did direct S.G. to send payments for methamphetamine to a variety of names and addresses that **JACOBO** chose.

22. The people to whom **JACOBO** would and did direct S.G. to send payments for methamphetamine included individuals in Mexico.

23. The **S.G. DTO** would and did use cellular telephones to communicate about the activities of the DTO, including by using voice calls, text messages, and messages using the electronic messaging feature of "WhatsApp," a smartphone application.

24. S.G. would and did take photos of cash and photos of receipts from money remitters and from the U.S. Postal Service and send these photos to **JACOBO** to show proof of payment.

25. **JACOBO** would and did change phones and phone numbers frequently, in an attempt to avoid detection by law enforcement.

26. While S.G. was living in Grove, **JACOBO** would and did request that S.G. regularly provide **JACOBO** new names and addresses to accept shipment of mail parcels containing methamphetamine, in an attempt to avoid detection by law enforcement.

27. While S.G. was living in Grove, S.G. used a variety of subdistributors, including people known to the Grand Jury as "M.J." and "J.T.," to help redistribute the methamphetamine from **JACOBO** to users and addicts in Northeast Oklahoma and Southwest Missouri.

All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A)(viii).

## COUNT THREE
### [21 U.S.C. §§ 846 and 841(b)(1)(A)(viii)]

Beginning as early as in or about September 2018 and continuing until in or about August 2019, in the Northern District of Oklahoma and elsewhere, the defendant, **LUIS ALFREDO JACOBO**, a/k/a "Lokz," did knowingly, intentionally, and willfully conspire, confederate, and agree with "M.J.," a person known to the Grand Jury, and others known and unknown to the Grand Jury, collectively referred to as the **M.J. DRUG TRAFFICKING ORGANIZATION ("M.J. DTO")**, to commit offenses against the United States, as follows:

### OBJECTS OF THE M.J. CONSPIRACY

The objects of the **M.J. CONSPIRACY** were:

1. To possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code Section 841(a)(1).

2. To distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code Section 841(a)(1).

### PURPOSE OF THE M.J. CONSPIRACY

The purpose of the **M.J. CONSPIRACY** was to enrich the **M.J. DTO** illegally through the illicit sale of methamphetamine to addicts and drug users who had no lawful means of acquiring the controlled substance.

## MEANS AND METHODS OF THE M.J. CONSPIRACY

The objects of the **M.J. CONSPIRACY** were accomplished by the following means and methods, among others:

3. **JACOBO** would and did obtain methamphetamine from **JACOBO**'s sources of supply in Mexico and would and did distribute it to subdistributors like M.J. for resale to addicts and users, so that the **M.J. DTO** would profit from the sales.

4. The **M.J. DTO** would and did use **JACOBO**'s hometown of Bakersfield, California, as a base of operations.

5. During the course of the **M.J. CONSPIRACY**, M.J. lived in and around Grove, Oklahoma, which is in the Northern District of Oklahoma, and received methamphetamine from **JACOBO**, and from others whom **JACOBO** directed, via mail parcel.

6. At all times, **JACOBO** directed and organized the activities of the **M.J. DTO** from Bakersfield, California, including setting the prices M.J. would pay **JACOBO**, determining the method of delivery of methamphetamine to M.J., determining the method of payment to **JACOBO**, and approving any suggestions M.J. would make about how the **M.J. DTO** would operate.

7. During the first month of the **M.J. CONSPIRACY**, **JACOBO** would and did cause M.J. to be provided with approximately one or two pounds of methamphetamine every ten to fourteen days.

8. During each subsequent month of the **M.J. CONSPIRACY, JACOBO** would and did cause M.J. to be provided with approximately five pounds of methamphetamine every ten to fourteen days.

9. **JACOBO** would and did charge M.J. approximately $3,000 per pound of methamphetamine.

10. M.J. would and did cause **JACOBO** to be paid for methamphetamine through various methods, as directed by **JACOBO**.

11. The ways in which M.J. would and did cause **JACOBO** to be paid included sending bundles of cash from the Northern District of Oklahoma and elsewhere to Bakersfield and elsewhere by mail parcel; transferring cash from the Northern District of Oklahoma and elsewhere to Bakersfield and elsewhere using money remitters like Western Union and MoneyGram; and transferring money electronically using smartphone applications like "Bluebird" by American Express.

12. **JACOBO** would and did use a "Bluebird" account that was linked to his email address "luisjacobo2014@gmail.com."

13. **JACOBO** would and did direct M.J. to send payments for methamphetamine to a variety of names and addresses that **JACOBO** chose.

14. The people to whom **JACOBO** would and did direct M.J. to send payments for methamphetamine included individuals in Mexico.

15. The **M.J. DTO** would and did use cellular telephones to communicate about the activities of the DTO, including by using voice calls, text messages, and messages using the electronic messaging feature of "WhatsApp," a smartphone application.

16. M.J. would and did take photos of cash and photos of receipts from money remitters and from the U.S. Postal Service and send these photos to **JACOBO** to show proof of payment.

17. **JACOBO** would and did change phones and phone numbers frequently, in an attempt to avoid detection by law enforcement.

18. **JACOBO** would and did request that M.J. regularly provide **JACOBO** new names and addresses to accept shipment of mail parcels containing methamphetamine, in an attempt to avoid detection by law enforcement.

19. M.J. used a variety of subdistributors, including people known to the Grand Jury as "J.T.," "K.H.," "K.S.," and "C.H.," to help redistribute the methamphetamine from **JACOBO** to users and addicts in Northeast Oklahoma and Southwest Missouri.

All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A)(viii).

## COUNT FOUR
### [21 U.S.C. §§ 846 and 841(b)(1)(A)(viii)]

Beginning as early as in or about September 2018 and continuing until in or about March 2021, in the Northern District of Oklahoma and elsewhere, the defendant, **LUIS ALFREDO JACOBO**, a/k/a "Lokz," did knowingly, intentionally, and willfully conspire, confederate, and agree with **WILLIAM DONOVAN JOHNSON III**, a/k/a "Billy Johnson," **SHAUNI BREANNE CALLAGY, KELLY WAYNE BRYAN, CURTIS ANTHONY JONES, JESUS VALDEZ MARTINEZ**, a/k/a "Jesse Martinez," a/k/a "Hostile," **ANTONIO CERVANTES GARCIA**, a/k/a "Tony Garcia," and others known and unknown to the Grand Jury, collectively referred to as the **JACOBO JOHNSON DRUG TRAFFICKING ORGANIZATION ("JACOBO JOHNSON DTO")**, to commit offenses against the United States, as follows:

### OBJECTS OF THE JACOBO JOHNSON CONSPIRACY

The objects of the **JACOBO JOHNSON CONSPIRACY** were:

1. To possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code Section 841(a)(1).

2. To distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code Section 841(a)(1).

13

## PURPOSE OF THE JACOBO JOHNSON CONSPIRACY

The purpose of the **JACOBO JOHNSON CONSPIRACY** was to enrich the **JACOBO JOHNSON DTO** illegally through the illicit sale of methamphetamine to addicts and drug users who had no lawful means of acquiring the controlled substance.

## MEANS AND METHODS OF THE JACOBO JOHNSON CONSPIRACY

The objects of the **JACOBO JOHNSON CONSPIRACY** were accomplished by the following means and methods, among others:

3. **JACOBO** would and did obtain methamphetamine from **JACOBO**'s sources of supply in Mexico and would and did distribute it to subdistributors like **JOHNSON** and the other members of the **JACOBO JOHNSON DTO** for resale to addicts and users so that the **JACOBO JOHNSON DTO** would profit from the sales.

4. The **JACOBO JOHNSON DTO** would and did use **JACOBO**'s hometown of Bakersfield, California, as a base of operations.

5. During the course of the **JACOBO JOHNSON CONSPIRACY, JACOBO, GARCIA**, and others unknown to the grand jury lived in Bakersfield, California, and are collectively referred to as the **"CALIFORNIA GROUP."**

6. During the course of the **JACOBO JOHNSON CONSPIRACY, JOHNSON, CALLAGY, BRYAN, JONES, MARTINEZ**, and others known and unknown to the Grand Jury lived in and around Grove, Oklahoma, which is in the Northern

District of Oklahoma; Miami, Oklahoma, which is in the Northern District of Oklahoma; Marshfield, Missouri; and other locations in the Northern District of Oklahoma and in Southwest Missouri, and are collectively referred to as the **"OKLAHOMA GROUP."**

7. **JACOBO** would and did direct the **CALIFORNIA GROUP** to send methamphetamine to the **OKLAHOMA GROUP** "on front," or without the **OKLAHOMA GROUP**'s paying upfront for the methamphetamine.

8. The **JACOBO JOHNSON DTO** would and did use multiple methods to get methamphetamine from the **CALIFORNIA GROUP** to the **OKLAHOMA GROUP**, always at **JACOBO**'s discretion.

9. The **JACOBO JOHNSON DTO** would and did use multiple methods to get payment for the methamphetamine from the **OKLAHOMA GROUP** to the **CALIFORNIA GROUP**, always at **JACOBO**'s discretion.

10. One method the **CALIFORNIA GROUP** would and did use to send methamphetamine to the **OKLAHOMA GROUP** was through mail parcel.

11. One method the **CALIFORNIA GROUP** would and did use to send methamphetamine to the **OKLAHOMA GROUP** was by sending members of the **CALIFORNIA GROUP** to the Northern District of Oklahoma and Southwest Missouri, with methamphetamine concealed in vehicles, to meet members of the **OKLAHOMA GROUP**.

12. One method the **CALIFORNIA GROUP** would and did use to send methamphetamine to the **OKLAHOMA GROUP** was by directing members of the **OKLAHOMA GROUP** to drive vehicles to Bakersfield, Las Vegas, and other areas and drive vehicles back to the Northern District of Oklahoma and Southwest Missouri with methamphetamine concealed inside.

13. One method the **OKLAHOMA GROUP** would and did use to pay **JACOBO** for methamphetamine was by sending quantities of cash to the **CALIFORNIA GROUP** via mail parcel.

14. One method the **OKLAHOMA GROUP** would and did use to pay **JACOBO** for methamphetamine was by sending members of the **OKLAHOMA GROUP** to California and other locations in vehicles with cash concealed inside to meet members of the **CALIFORNIA GROUP**.

15. The **OKLAHOMA GROUP** would and did send people including **MARTINEZ** and others known to the Grand Jury as "G.R.," "R.H.," and "J.D." to California and other places to distribute cash to the **CALIFORNIA GROUP** and to pick up methamphetamine to be brought back to members of the **OKLAHOMA GROUP**.

16. The **CALIFORNIA GROUP** would and did send people including **GARCIA** to Oklahoma and other places to distribute methamphetamine to the **OKLAHOMA GROUP**.

17. All details regarding travel by members of the **JACOBO JOHNSON DTO** were arranged with the knowledge of and approval by **JACOBO**.

18. The **CALIFORNIA GROUP** would and did use methods including cellular telephone calls and text messages to communicate with the **OKLAHOMA GROUP**.

19. The **JACOBO JOHNSON DTO** members would and did use storage units in the Northern District of Oklahoma and Southwest Missouri to store bulk quantities of methamphetamine, cash, or both methamphetamine and cash.

20. The **JACOBO JOHNSON DTO** would and did cause to be distributed quantities of methamphetamine of up to at least 100 pounds at a time.

21. The **JACOBO JOHNSON DTO** would and did cause to be transported quantities of cash of up to at least $400,000 at a time.

All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A)(viii).

## COUNT FIVE
### [21 U.S.C. §§ 846 and 841(b)(1)(A)(viii)]

Beginning as early as in or about September 2020 and continuing until on or about October 10, 2020, in the Northern District of Oklahoma and elsewhere, the defendants, **WILLIAM DONOVAN JOHNSON III**, a/k/a "Billy Johnson," **DAVID SCOTT CHAMBERS**, a/k/a "Scott Chambers," and **SHAUNI BREANNE CALLAGY**, did knowingly, intentionally, and willfully conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury to distribute and to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code Section 841(a)(1).

All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A)(viii).

## COUNT SIX
### [21 U.S.C. §§ 856(a)(1) and 856(b)]

Beginning as early as in or about September 2020 and continuing until on or about October 10, 2020, in the Northern District of Oklahoma, the defendants, **WILLIAM DONOVAN JOHNSON III**, a/k/a "Billy Johnson," and **SHAUNI BREANNE CALLAGY**, did knowingly lease, rent, use, and maintain a place located at GPS Satellite Coordinates 36.638779, -94.681428, in Grove, Oklahoma, for the purpose of distributing and using methamphetamine, a Schedule II controlled substance.

All in violation of Title 21, United States Code, Sections 856(a)(1) an 856(b).

## COUNT SEVEN
### [21 U.S.C. §§ 856(a)(1) and 856(b)]

Beginning as early as in or about September 2020 and continuing until on or about October 10, 2020, in the Northern District of Oklahoma, the defendants, **WILLIAM DONOVAN JOHNSON III**, a/k/a "Billy Johnson," and **SHAUNI BREANNE CALLAGY**, did knowingly lease, rent, use, and maintain a place located at 26371 South 650 Road, Grove, Oklahoma, for the purpose of distributing and using methamphetamine, a Schedule II controlled substance.

All in violation of Title 21, United States Code, Sections 856(a)(1) an 856(b).

## COUNT EIGHT
## [18 U.S.C. § 1952(a)(3)]

On or about October 10, 2020, in the Northern District of Oklahoma and elsewhere, the defendant, **DAVID SCOTT CHAMBERS**, a/k/a "Scott Chambers," travelled in interstate commerce from the State of Missouri to the State of Oklahoma with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, Possession of Methamphetamine with Intent to Distribute, in violation of Title 21, United States Code, Section 841(a)(1), and thereafter performed and attempted to perform an act to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying of such unlawful activity.

All in violation of Title 18, United States Code, Section 1952(a)(3).

## COUNT NINE
### [21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii)]

On or about October 12, 2020, in the Northern District of Oklahoma, the defendant, **GENE OLEN CHARLES RAST**, knowingly and intentionally possessed with the intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance.

All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii).

## COUNT TEN
## [18 U.S.C. § 924(c)(1)(A)(i)]

On or about October 12, 2020, in the Northern District of Oklahoma, the defendant, **GENE OLEN CHARLES RAST**, knowingly possessed a firearm in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, that is, Possession of Methamphetamine with Intent to Distribute, a violation of Title 21, United States Code, Section 841(a)(1), as set forth more fully in Count Nine of this Indictment.

All in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

## COUNT ELEVEN
### [21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii)]

On or about May 31, 2019, in the Northern District of Oklahoma, the defendant,

**WILLIAM DONOVAN JOHNSON III**, knowingly and intentionally possessed

with the intent to distribute 50 grams or more of methamphetamine, a Schedule II

controlled substance, its salts, isomers, and salts of its isomers.

All in violation of Title 21, United States Code, Sections 841(a)(1) and

841(b)(1)(A)(viii).

## COUNT TWELVE
### [21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C)]

On or about March 21, 2021, in the Northern District of Oklahoma, the

defendant, **RENEE LYNN HAYNES**, knowingly and intentionally possessed with

the intent to distribute methamphetamine, a Schedule II controlled substance.

All in violation of Title 21, United States Code, Sections 841(a)(1) and

841(b)(1)(C).

## COUNT THIRTEEN
### [18 U.S.C. § 1952(a)(3)]

Beginning on or about March 18, 2021, and continuing to on or about March 21, 2021, in the Northern District of Oklahoma and elsewhere, the defendant, **RENEE LYNN HAYNES**, travelled in interstate commerce from the State of California to the State of Oklahoma with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, Possession of Methamphetamine with Intent to Distribute, in violation of Title 21, United States Code, Section 841(a)(1), and thereafter performed and attempted to perform an act to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying of such unlawful activity.

All in violation of Title 18, United States Code, Section 1952(a)(3).

# FORFEITURE ALLEGATION
## [21 U.S.C. § 853, 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461]

The allegations contained in this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853, Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461.

Upon conviction of the offenses alleged in this Indictment, as a part of his sentence, the defendant, **WILLIAM DONOVAN JOHNSON III**, a/k/a "Billy Johnson," shall forfeit to the United States any property constituting, or derived from, or traceable to, the proceeds obtained, directly or indirectly, as a result of such drug and racketeering violations and any property, real or personal, that was used or intended to be used to commit or to facilitate the violation of federal drug law. The property to be forfeited includes, but is not limited to:

**MONEY JUDGMENT**

1. A money judgment in an amount representing proceeds obtained by the Defendant **WILLIAM DONOVAN JOHNSON, III** as a result of the offenses;

**CURRENCY**

2. $646.00 in United States currency, seized from William Donovan Johnson, III, on October 12, 2020;

3. $38,806.00 in United States currency, seized from a trailer located in Cayuga Park Resort on October 12, 2020;

4. $16,475 in United States currency, seized from Room 2214 of the Downstream Casino Resort on June 1, 2019;

27

5. $65,533 in United States currency, seized from a trailer located at South 650 Road on October 12, 2020;

6. $1,467.11 in United States currency, seized from a GMC Sierra pickup truck parked near a trailer at South 650 Road on October 12, 2020;

**FIREARMS**

7. A Jennings T380-CA .380 semi-automatic pistol, serial number 1466709;

**VEHICLES**

8. A White Ford [Flatbed Truck], MO Tag # 7SFW68;

9. A 2020 Dodge Challenger, MO Tag # LE4F2W; and

**PERSONAL PROPERTY**

10. A trailer parked at 26371 South 650 Road, Grove, Oklahoma, 74344.

Upon conviction of the offenses alleged in this Indictment, as a part of his sentence, the defendant, **DAVID SCOTT CHAMBERS**, a/k/a "Scott Chambers," shall forfeit to the United States any property constituting, or derived from, or traceable to, the proceeds obtained, directly or indirectly, as a result of such drug and racketeering violations and any property, real or personal, that was used or intended to be used to commit or to facilitate the violation of federal drug law. The property to be forfeited includes, but is not limited to:

**MONEY JUDGMENT**

1. A money judgment in an amount of at least $48,000, representing proceeds obtained by the Defendant **DAVID SCOTT CHAMBERS** as a result of the offenses;

**CURRENCY**

2. $4,630.00 in United States currency, seized from the 2012 white Chevy Equinox on October 10, 2020;

3. $1,113.00 in United States currency, seized from a 2012 white Chevy Equinox on October 10, 2020;

4. $800 in United States currency, seized from the 2012 white Chevy Equinox on October 10, 2020; and

5. $59,790.00 in United States currency, seized from the 2012 white Chevy Equinox on October 10, 2020.

Upon conviction of the offenses alleged in this Indictment, as a part of his sentence, the defendant, **GENE OLEN CHARLES RAST**, a/k/a "Charlie Rast," shall forfeit to the United States any property constituting, or derived from, or traceable to, the proceeds obtained, directly or indirectly, as a result of such drug and racketeering violations and any property, real or personal, that was used or intended to be used to commit or to facilitate the violation of federal drug law. The property to be forfeited includes, but is not limited to:

**FIREARMS AND AMMUNITION**

1. A Ruger, .22 caliber revolver, serial number 20-96958;

2. A Jennings T380-CA, .380 semi-automatic pistol, serial number 1466709;

3. A Taurus, .40 caliber semi-automatic, serial number STE 17971; and

4. Any and all ammunition; and

**CURRENCY**

5. $1,467.11 in United States currency, seized from a GMC Sierra pickup truck parked near a trailer at South 650 Road on October 12, 2020.

Upon conviction of the offenses alleged in this Indictment, as a part of her sentence, the defendant, **SHAUNI BREANNE CALLAGY** shall forfeit to the United States any property constituting, or derived from, or traceable to, the proceeds obtained, directly or indirectly, as a result of such drug and racketeering violations and any property, real or personal, that was used or intended to be used to commit or to facilitate the violation of federal drug law. The property to be forfeited includes, but is not limited to:

**CURRENCY**

1. $38,806.00 in United States currency, seized from a trailer located in Cayuga Park Resort on October 12, 2020;

**FIREARMS**

2. A Jennings T380-CA .380 semi-automatic pistol, serial number 1466709; and

**VEHICLE**

3. A Silver Kia Optima, MO Tag # TGOS6P.

Upon conviction of the offenses alleged in this Indictment, as a part of her sentence, the defendant, **RENEE LYNN HAYNES** shall forfeit to the United States any property constituting, or derived from, or traceable to, the proceeds obtained,

directly or indirectly, as a result of such drug and racketeering violations and any property, real or personal, that was used or intended to be used to commit or to facilitate the violation of federal drug law. The property to be forfeited includes, but is not limited to:

**VEHICLE**

1. A Silver Kia Optima, MO Tag # TGOS6P.


Upon conviction of the offenses alleged in this Indictment, as a part of her sentence, the defendant, **LUIS ALFREDO JACOBO**, a/k/a "Lokz," shall forfeit to the United States any property constituting, or derived from, or traceable to, the proceeds obtained, directly or indirectly, as a result of such drug and racketeering violations and any property, real or personal, that was used or intended to be used to commit or to facilitate the violation of federal drug law. The property to be forfeited includes, but is not limited to:

**MONEY JUDGMENT**

1. A money judgment in an amount representing proceeds obtained by the Defendant **LUIS ALFREDO JACOBO** as a result of the offenses; and

**REAL PROPERTY**

2. All that lot and parcel of land, together with all buildings, appurtenances, improvements, fixtures, attachments and easements thereon, and all rights appertaining thereto, located at 225 Marsh Street, Bakersfield, California, 93307.

Upon conviction of the offenses alleged in this Indictment, as a part of her sentence, the defendant, **JESUS VALDEZ MARTINEZ**, a/k/a "Jesse Martinez," a/k/a "Hostile," shall forfeit to the United States any property constituting, or derived from, or traceable to, the proceeds obtained, directly or indirectly, as a result of such drug and racketeering violations and any property, real or personal, that was used or intended to be used to commit or to facilitate the violation of federal drug law.

Upon conviction of the offenses alleged in this Indictment, as a part of her sentence, the defendant, **KELLY WAYNE BRYAN**, shall forfeit to the United States any property constituting, or derived from, or traceable to, the proceeds obtained, directly or indirectly, as a result of such drug and racketeering violations and any property, real or personal, that was used or intended to be used to commit or to facilitate the violation of federal drug law.

Upon conviction of the offenses alleged in this Indictment, as a part of her sentence, the defendant, **CURTIS ANTHONY JONES** shall forfeit to the United States any property constituting, or derived from, or traceable to, the proceeds obtained, directly or indirectly, as a result of such drug and racketeering violations and any property, real or personal, that was used or intended to be used to commit or to facilitate the violation of federal drug law.

**CURRENCY**

1. $65,533 in United States currency, seized from a trailer located at South 650 Road on October 12, 2020; and

**REAL PROPERTY**

2. All that lot and parcel of land, together with all buildings, appurtenances, improvements, fixtures, attachments and easements thereon, and all rights appertaining thereto, located at the premises at 26371 South 650 Road, Grove, Oklahoma, 74344.

Upon conviction of the offenses alleged in this Indictment, as a part of her sentence, the defendant, **ANTONIO CERVANTES GARCIA**, a/k/a "Tony Garcia," shall forfeit to the United States any property constituting, or derived from, or traceable to, the proceeds obtained, directly or indirectly, as a result of such drug and racketeering violations and any property, real or personal, that was used or intended to be used to commit or to facilitate the violation of federal drug law. The property to be forfeited includes, but is not limited to:

**VEHICLES**

1. A Red GMC Sierra, CA Tag # 8F99419; and

**CURRENCY**

2. $1,467.11 in United States currency, seized from a GMC Sierra pickup truck parked near a trailer at South 650 Road on October 12, 2020.

Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1) and 1028(g), and Title 28, United States Code, Section 2461(c), the defendants shall forfeit substitute property, up to the value of the property described above if, by any act or omission of the defendants, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

All pursuant to Title 18, United States Code, Section 853, Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461.

CLINTON J. JOHNSON
Acting United States Attorney

A TRUE BILL

THOMAS E. DUNCOMBE
Assistant United States Attorney

*/s/ Grand Jury Foreperson*
Grand Jury Foreperson